IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
May 24, 2012 Session

## TOWN OF MIDDLETON, TENNESSEE, ET AL. v. CITY OF BOLIVAR, TENNESSEE, ET AL.

**Appeal from the Chancery Court for Hardeman County**
**No. 16308      Martha Brasfield, Chancellor**

**No. W2011-01592-COA-R3-CV- Filed July 13, 2012**

In this case, we are asked to address the question of whether the Municipal Gas System Tax Equivalent Law of 1987, Tennessee Code Annotated Section 7-39-401 through 406, or the Revenue Bond Law,  Tennessee Code Annotated Section 7-34-101, *et seq*., negate the provisions of ordinances passed by Appellees, the Town of Middleton, Tennessee and the Town of Whiteville, Tennessee, which granted Appellant, the City of Bolivar and its municipal utility, the right to franchise in the Appellee towns.  We conclude that: (1) Appellants may be liable for both franchise fees under the ordinances, and for payments in lieu of taxes under the Municipal Gas System Tax Equivalent Law because franchise fees are not in the nature of taxes on the valuation of property and are "operating expenses" for the privilege of doing business; (2) although the ordinances initially granted Bolivar's utility exemption from payments in lieu of taxes to Appellees, by resolution, Bolivar waived its exemption and is now obligated to make payments in lieu of taxes to Appellees under the Municipal Gas System Tax Equivalent Law; (3) to the extent that the Whiteville ordinance conflicts with Bolivar's statutory right to charge consumers for the actual costs of its services (which would include the franchise fee expenses), it is void; (4) the trial court's award of *pendente lite* payments to Appellees was not reversible error in light of our holding that Appellees were (and are) entitled to the franchise fees.  Reversed in part, affirmed in part, and remanded.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Chancery Court Reversed in Part; Affirmed in Part and Remanded**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

William B. Hubbard and Cynthia Hubbard Wiel, Nashville, Tennessee, for the appellants, City of Bolivar and Bolivar Gas Department.

James Andrew Farmer and Charles H. Farmer, Jackson, Tennessee, for the appellees, City of Middleton, Tennessee and City of Whiteville, Tennessee.

## OPINION

### Factual History

In 1953 and 1954 respectively, the Town of Middleton, Tennessee ("Middleton") and the Town of Whiteville, Tennessee ("Whiteville," and together with Middleton, "Plaintiffs," or "Appellees") passed ordinances based upon an agreement reached between Whiteville and Middleton and the City of Bolivar, Tennessee ("Bolivar"). Under these ordinances, the Bolivar Gas Company ("BGC," and together with Bolivar, "Defendants," or "Appellants")[1] was granted the right to occupy property within Middleton and Whiteville's corporate limits for purposes of providing gas to the residential and commercial consumers located in Whiteville and Middleton.

The 1954 Whiteville Ordinance

Whiteville adopted its ordinance on April 14, 1954 (the "Whiteville Ordinance"). The Whiteville Ordinance granted Bolivar (doing business as BGC f/k/a Bolivar Natural Gas System) the right to:

> use and occupy [Whiteville's], streets, avenues, roads, alleys, lanes, parks and other public places and ways for the purpose of. . . laying, constructing, extending, maintaining, renewing, replacing and/or repairing mains and pipes and all appurtenances and appendages thereto used and/or useful for the manufacture, transmission, distribution and/or sale of gas within and/or through the present or future territorial limits of [Whiteville].

The Whiteville Ordinance refers to this grant as a "franchise." In exchange for the right to "franchise" its services to Whiteville, the ordinance provides that Bolivar will make monthly payments to Whiteville in the amount of two percent (2%) of BGC's monthly revenues generated from rates charged to Whiteville customers, and that this 2% gross receipts payment would be made in lieu of taxes and assessments:

---

[1] BGC is a government subdivision of the City of Bolivar. Therefore, for purposes of this opinion, we may refer to the Appellants together as "Bolivar."

SECTION II.  The Grantee [i.e. Bolivar] shall be entitled to charge, for gas furnished by it, a rate which may not exceed the rates applicable to the consumers inside the City of Bolivar, Tennessee; providing that the Town of Whiteville, Tennessee, herein grants to the Grantee, for the duration of this franchise, an exemption from all taxes and assessments; further providing that in consideration for these benefits and gas franchise, the Town of Bolivar, Tennessee shall pay to the Town of Whiteville, 2% of the Domestic and Commercial Gross Receipts collected from the gas system in Whiteville . . . .

The Whiteville Ordinance provides for an initial term of thirty (30) years: "such right to continue for thirty (30) years after date of approval of this Ordinance by the Mayor and Council of the Town of Whiteville." The Whiteville Ordinance is signed by the Mayor and the Board of Aldermen.

The 1953 Middleton Ordinance

On April 24, 1953, Middleton also adopted a thirty-year ordinance, which granted Bolivar (doing business as BGC) a franchise to provide gas service for the residents of Middleton (the "Middleton Ordinance"). Like the Whiteville Ordinance, the Middleton Ordinance imposed a 2% gross receipts charge to Bolivar in lieu of taxes and assessments in exchange for the right to franchise. The quoted language set out above from the Whiteville Ordinance is identical to the language used in the Middleton Ordinance, except for the language addressing rates charged to consumers. As set out in Section II above, the Whiteville Ordinance states that the rates charged by Bolivar to Whiteville consumers "may not exceed the rates applicable to the consumers inside the City of Bolivar." The Middleton Ordinance, however, entitles Bolivar "to charge for gas furnished by it, a rate which may not exceed by 2% the rates applicable to the [Bolivar] consumers." This is the only difference between the two ordinances. The Middleton Ordinance is signed by the Mayor of Middleton.

Payments Made by Bolivar under the Ordinances

The record indicates that Bolivar paid the 2% of gross receipts to Whiteville as contemplated under the ordinance. However, as to the payments allegedly owed to Middleton, the record contains a letter dated October 31, 1962 from Bolivar's lawyer to Middleton's lawyer. This letter is in response to a claim by Middleton against Bolivar for the 2% payments, which Bolivar had allegedly failed to pay since the passage of the Middleton Ordinance. The letter indicates that the Middleton Ordinance "was never formally accepted by the officials of the Town of Bolivar, but it was accepted by the Mayor of

Middleton rather than the Mayor of Bolivar." The letter mentions nothing further concerning the validity of the Middleton Ordinance. Concerning the payment of 2% of gross receipts contemplated under the ordinance, the letter states:

> It is the understanding of the present Mayor and City Council that at the time [the Middleton ordinance was passed] there was a mutual understanding between the officials of the town of Bolivar and the officials of the town of Middleton that the gas consumers of Middleton would be charged the same rate as the consumers in Bolivar and that the town of Middleton would no[t] require Bolivar to pay 2% of the gross receipts as provided in the contract [i.e., ordinance]. On the 13th day of March, 1962, the Mayor and Aldermen of Middleton met with the City Council of Bolivar and requested that Bolivar pay to Middleton 2% of the gross receipts from the time the system began operating. . . . It seems that it was the feeling of the Mayor and Council that Bolivar should pay Middleton 2% of the gross receipts beginning with the receipts accruing from and after March 1, 1962, and not to pass this burden on to the gas consumers in Middleton by increasing their rates, but in view of all the circumstances they did not feel that they should be required to pay for the time that has expired before the said demand. Checks covering these payments have been made to the Town of Middleton since that time.

The letter goes on to state that, at that time, the revenues received from the gas system were being used for the payment of revenue bonds issued to construct the utility system, and had not been operating at a profit. Consequently, Bolivar indicated that, should Bolivar be "compelled to pay to the Town of Middleton 2% of the gross receipts collected from the system in Middleton for the years prior to 1962, [Bolivar] will feel compelled to add 2% to the bills of the gas consumers in the Town of Middleton." There is no indication in the record that Bolivar paid Middleton any percentage of its gross receipts from Middleton consumers accruing prior to the 1962 demand by Middleton. However, since that time, Bolivar has continued to pay the 2% of gross receipts to Middleton as contemplated under the ordinance. As will be discussed in more detail below, the Middleton Ordinance allowed this 2% fee to be taxed to Middleton consumers, whereas the Whiteville Ordinance only allowed Whiteville consumers to be charged rates no higher than those charged to Bolivar consumers. However, it is not clear in the record the exact rates that were charged by BGC to consumers in either Whiteville or Middleton.

In 1993, the Tennessee legislature passed amendments to the Revenue Bond Law, Tennessee Code Annotated Section 7-34-101, *et seq*. (the "RBL"). Following the amendments, Bolivar employed an accountant to opine as to the effect, if any, of the amendments on Bolivar's dealings with its utility and the municipalities serviced by the BGC. Bolivar specifically requested an opinion as to whether it was required to make payments-in-lieu-of-taxes ("PILOT") to the municipalities serviced by its gas utility.[2]

On April 12, 1994, Certified Public Accountant Michael Hewitt sent a letter to Bolivar stating, in relevant part, that:

> I discussed with the comptroller's office the possibility of [Bolivar] having to share the total tax equivalent with the other governmental units in which the gas operations are located. It was their interpretation of the law that this was mandatory. I would suggest that you consider asking for an attorney general's opinion on this issue. Until you get clarification of this issue, I would also suggest trying to limit public discussions of it since the city is not currently sharing the tax equivalent with other governmental entities.

There is no indication in the record that Bolivar followed Mr. Hewitt's recommendation to obtain an opinion from the Attorney General. In fact, there is no indication in the record that Bolivar modified its payments at all. Rather, Bolivar continued to make the 2% gross receipt payments to Middleton and Whiteville, but never addressed whether the amended Revenue Bond Law required PILOT in lieu of, or in addition to, the gross receipt payments.

Although it was not paying either Whiteville or Middleton PILOT, the record indicates that Bolivar was taking PILOT from its utility, BGC. On January 30, 2006, the Bolivar mayor received a letter from Dennis Dycus, the Director of the Division of Municipal Audit of the Audit Department of the Tennessee Comptroller of the Treasury. In his letter, Mr. Dycus indicates that, in reviewing Bolivar's audited financial statements for 2005, he had discovered that Bolivar had likely been taking PILOT from its gas utility far in excess of the amount permitted by the Municipal Gas System Tax Equivalent Law of 1987, Tennessee Code Annotated Section 7-39-401 through 406 (the "MGSTEL"). The letter states: "Assuming our calculations are correct, the . . . gas system paid $159,750 in excess

___

[2] PILOT may also be referred to herein as either a "tax equivalent payment," or an "*ad valorem*" tax. An *ad valorem* tax (from the Latin, meaning "according to value") is a tax based on the value of real estate or personal property. *See* Black's Law Dictionary 53 (7th ed. 1999).

of the maximum amount allowed under the statutes . . . ." Mr. Dycus then informed Bolivar that, under Tennessee Code Annotated Section 7-34-115(f) of the RBL, repayment of these overpayments was required and that any city official in violation of the law could face ouster. It was the opinion of Mr. Dycus that Bolivar was exceeding the statutory limit on PILOT it could receive from its own utility. Mr. Dycus suggested that Bolivar make plans to repay the excess PILOT to its utility.

In the face of possible underpayment of PILOT to the municipalities (e.g., Middleton and Whiteville) that BGC serviced, and the possibility of having taken overpayment of PILOT from its own utility, Bolivar sought a second opinion from the Municipal Technical Advisory Service at the University of Tennessee (the "MTAS"). By letter of August 15, 2006, Melissa Ashburn, Legal Consultant with the MTAS, informed Bolivar that Mr. Dycus' assessment was correct. Concerning Bolivar's obligation to pay PILOT to Whiteville and Middleton, Ms. Ashburn stated that, although she did not review the actual ordinances granting franchise rights to Bolivar in Whiteville and Middleton, she was of the opinion that:

> [I]n general. . . payments made under a franchise agreement are different than payments made in lieu of taxes. Franchise payments are made based on amounts billed by the utility to customers located in the city limits, while tax equivalent payments are based on the valuation of property owned by the utility. The Attorney General has opined that a gross receipts tax on earnings of utility districts cannot supplant the present system of property taxation upon which tax equivalent payments are made. Tenn. Op. Atty. Gen. No. 83-127. Based on such reasoning, and the very different nature of such payments, it does not appear that payments made by Bolivar Gas under the franchise agreement can be credited against the amount owed in tax equivalent payments.

The MTAS was of the opinion that, although BGC was obligated to pay some PILOT to Bolivar, Bolivar had been taking excessive PILOT from BGC. The MTAS further opined that, in addition to having to repay its utility, Bolivar was also obligated to pay Whiteville and Middleton the franchise fees that were contemplated under the ordinances (i.e., the 2% gross receipts fees). Concerning BGC's payment obligations, the MTAS opined that, in addition to making PILOT to Bolivar, BGC could also be liable for PILOT to other municipalities (i.e., Whiteville and Middleton). Bolivar requested that its lawyer provide an opinion on the issues.

On March 27, 2007, Bolivar received an opinion letter from its lawyer concerning

what future payments Bolivar might owe to Whiteville and Middleton. In relevant part, Bolivar's lawyer opined that "future payments to the [towns] should be limited to [PILOT] . . . not to exceed the amount of taxes payable on privately owned property of similar nature and also not to exceed the amount calculated pursuant to the formula contained in T.C.A. § 7-39-404." This opinion was based upon the lawyer's assessment that, under Tennessee Code Annotated Section 7-34-115(a)(9), the towns could resolve to be paid PILOT "on [Bolivar's utility] property" located in the respective towns. The lawyer opined that the RBL restricts the payments a utility may make to a municipality for direct and indirect operating expenses. Accordingly, the lawyer concluded that BGC is not statutorily authorized to pay the franchise fee of 2% of its gross receipts; based upon this opinion, the lawyer stated that the towns were only entitled to PILOT. Relying upon its lawyer's advice, by letters dated April 18, 2007, Bolivar informed Middleton and Whiteville that it would no longer pay the 2% gross receipts franchise fee; Bolivar did not indicate any intention to make PILOT to these towns.

**Procedural History**

On September 21, 2007, Whiteville filed suit against Bolivar and BGC, alleging three causes of action: (1) breach of contract in ceasing payment of the 2% gross receipts contemplated under the Whiteville Ordinance; (2) conversion for same; and (3) violation of the RBL in failing to make PILOT to Whiteville as required thereunder. On October 31, 2007, Middleton filed suit against Bolivar and BGC, alleging exactly the same causes of action as alleged by Whiteville in its complaint.

Bolivar moved to dismiss these complaints, arguing that; (1) it could not honor its promises under the ordinances because the RBL, as amended, prevents BGC from being a "source of revenue" to Whiteville and Middleton; (2) the MGSTEL, as amended, prescribes the only type, and the maximum amount of, any payments BGC may make to another municipality for any reason; (3) the ordinances, upon which Whiteville and Middleton rely, expired more than twenty years before Bolivar stopped making the 2% gross receipt payments. By separate but identical orders, both entered on March 28, 2008, with amended orders entered on May 27, 2008, the trial court denied Bolivar's motions to dismiss. The trial court specifically rejected Bolivar's statutory argument, finding that the franchise fees contemplated under the ordinances were "operating expenses" or "other obligations" of the utility, which the RBL expressly authorized Bolivar to pay. The trial court's orders do not address Bolivar's MGSTEL argument, or its argument that the ordinances had "expired."

On April 11, 2008, Bolivar filed separate but identical motions to alter or amend the trial court's judgments. In these motions, Bolivar noticed the court that it had passed resolutions, effective March 24, 2008, resolving to make PILOT to Middleton and Whiteville

-7-

for fiscal year 2007–2008 and going forward pursuant to Tennessee Code Annotated Section 7-39-404(4).[3] Based upon the passage of these resolutions purportedly adopting PILOT, Bolivar's motions to alter or amend asserted that Middleton and Whiteville could not receive both PILOT and 2% of the gross receipts payments under the ordinances. Therefore, Bolivar reasoned that its resolution to pay PILOT meant that it was no longer obligated to pay the 2% gross receipts payments.

The motions to dismiss were heard on June 23, 2008. While the trial court acknowledged that Bolivar's resolutions had "changed the complexity" of the litigation, the Chancellor nonetheless rejected Bolivar's notion that it could "resolve" to force Whiteville and Middleton to accept PILOT under the MGSTEL *instead of* the 2% gross receipts payments under the ordinances. Specifically, the trial court reasoned that:

> If Bolivar wishes to allow [PILOT] on property within their city limit, they do it. And the same with Whiteville. Whiteville decides if they want [PILOT] within their city limits. And the same with Middleton.
>
> *             *             *
>
> So very simply, what I'm saying is, Bolivar can't decide that it wants [PILOT] for property it may have within the City of Whiteville. It's Whiteville that decides how they want to tax Bolivar's property that is in the City of Whiteville.
>
> The same with Middleton. If Bolivar has property within the City of Middleton, it is Middleton that says how they want

---

[3] Tennessee Code Annotated Section 7-39-404(4) provides:

> (4) The total amount to be paid as tax equivalents, including that to be paid for the municipality and any other taxing jurisdiction, for each fiscal year, determined in accordance with and subject to this part, shall be set forth in a resolution adopted by the municipality's governing body after consultation with the supervisory body, if different from the governing body, and the municipality's gas system shall pay to the municipality and any other specified taxing jurisdictions amounts as provided in that resolution. Such determination shall be made as early in such fiscal year as possible and shall become final at the end of such year;

to tax it.

Having effectively denied Bolivar's motions to alter or amend, and in light of its previous ruling upholding the validity of the 2% gross receipts payments, the trial court ordered the parties to conduct discovery related to the amount of payments Bolivar owed Whiteville and Middleton under the ordinances. By order of July 15, 2008, the court set the case for hearing on August 19, 2008.

Before proceeding with discovery, on August 1, 2008, Bolivar filed a motion for summary judgment against Middleton. On August 5, 2008 Bolivar filed an identical motion for summary judgment against Whiteville. As grounds for these motions, Bolivar reiterated the arguments it had espoused in its previous motions to dismiss, namely: (1) that the RBL prohibited Bolivar from paying PILOT and the 2% gross receipts payments (this argument was made despite the Chancellor's earlier ruling that the RBL did not prohibit the 2% gross receipt payments *per se*); (2) that the MGSTEL prescribes the exclusive type and amount of any payments BGC may make; and (3) expiration of the ordinances. The Chancellor ordered further briefing on the motions for summary judgment, and continued the hearing that had been scheduled for August 19, 2008. Before ruling on the motions for summary judgment, by order of November 14, 2008, the trial court consolidated these actions.

On December 28, 2008, the trial court entered an order, denying the motions for summary judgment. Therein, the trial court reiterated its previous ruling that the 2% gross receipt payments were not invalid or illegal under either the RBL or the MGSTEL. The court did note, however, that "Whiteville and Middleton are not entitled to the payment of both the 2% fee and also the tax equivalent/PILOT." The court further held that the parties had renewed their contractual rights and obligations, arising under the ordinances, by continuing to perform under the terms of the ordinances after the ordinances had "expired." Therefore, the Chancellor rejected Bolivar's position that it was entitled to avoid the 2% gross receipt payments under the "expiration" theory. The court did note that none of the parties had offered any law or procedure as to the proper method to terminate or amend the agreements/ordinances, but explained that Bolivar "should not have the right to simply discontinue the payments . . . or end the contract any more than Whiteville/Middleton can expect the contract to continue *ad infinitum*, without change or amendments." The court specifically held that Bolivar had not committed the tort of conversion, which holding is not before us for consideration in the instant appeal.

On January 29, 2009, Bolivar filed a motion for interlocutory appeal and for stay of the proceedings pending appeal. On February 3, 2009, Whiteville and Middleton filed an objection to Bolivar's motion, and also moved the court for *pendente lite* relief, arguing that Whiteville and Middleton are entitled to monetary payments as long as Bolivar continues to

use its franchises in the respective towns. In other words, Whiteville and Middleton argued that Bolivar could not continue to enjoy the benefit of the ordinance/contract, without incurring the burden. On March 23, 2009, the Chancellor held a hearing on the motion for *pendente lite* payments. By Order of March 31, 2009, the Chancellor granted the motion, stating, in relevant part, that:

> Upon review of the previously-filed pleadings, affidavits, exhibits, undisputed statements of fact, and the entire evidentiary record before this Court, as well as the memoranda of the parties and the arguments of counsel. . .the Court is of the opinion [that Whiteville and Middleton's] motion should be granted.
>
> It is, therefore, ORDERED, ADJUDGED, and DECREED that [Whiteville and Middleton's] motion for *pendente lite* relief should be, and is hereby GRANTED.
>
> Accordingly, Defendant City of Bolivar is ORDERED to make *pendente lite* payments to each Plaintiff municipality beginning in April 2009 and to continue paying same on a prospective monthly basis for twenty-four (24) months or until further order of this Court or a higher court.
>
> It is further, ORDERED that Defendant City of Bolivar's monthly payments to Plaintiff Town of Whiteville shall be made by checks drawn by Defendant City of Bolivar in the amount of $1,576.20 per month made payable to Plaintiff Town of Whiteville, Tennessee. This amount is based on the average monthly payment made by Defendant City of Bolivar to Plaintiff Town of Whiteville in the twleve (12) months immediately preceding Defendant City of Bolivar's cessation of payment in April of 2007. . . .
>
> It is further, ORDERED that Defendant City of Bolivar's monthly payments to Plaintiff Town of Middleton shall be made by checks drawn by Defendant City of Bolivar in the amount of $1,458.27 per month made payable to Plaintiff Middleton, Tennessee. This amount is based on the average monthly payment made by Defendant City of Bolivar to Plaintiff Town of Middleton, Tennessee in the twleve (12) months immediately preceding Defendant City of Bolivar's cessation of payment in April of 2007. . . .

By Order of July 8, 2009, this Court denied Bolivar's petition for interlocutory appeal.

Thereafter, Bolivar moved the trial court to appoint a special master to compute the amount of money owed to Whiteville and Middleton under the ordinances. The Chancellor granted the request and appointed a special master to calculate amounts owed under the ordinances since April 2001. In a report filed on November 24, 2010, the special master determined that, for the specified period, Bolivar owed Middleton $76,169.00 and owed Whiteville $84,360.00. The Chancellor approved the special master's report on February 10, 2011.

On June 29, 2011, the trial court entered what purported to be a final judgment. Therein, the court held that:

> (1) The ordinances between Bolivar and Middleton/Whiteville did not automatically end after the expiration of the 30-year time period, as the parties continued to operate under the terms and conditions of the original ordinances.
> (2) The 2% fee under the ordinances of Middleton and Whiteville is proper and legal under Tenn. Code Ann. §§7-34-101 *et seq*. and 7-39-401 *et seq.*
> (3) As long as the parties operate under the terms and conditions of the original ordinances, Middleton and Whiteville are entitled to receive the 2% franchise fee.
> (4) Under the ordinances, Middleton and Whiteville are not entitled to receive both the tax equivalent/PILOT payments, as set forth in Tenn. Code Ann. §7-39-401 *et seq*., and the 2% fee.
> (5) Bolivar may add the 2% fee to the rates of the customers within the city limits of Middleton as explicitly provided for in the Middleton ordinance.
> (6) There is no cause of action for the tort of conversion of property of Middleton or Whiteville against Bolivar.
>
> *                    *                    *
>
> (8) This Court finds that the *pendente lite* payments made by Bolivar relate to the 2% franchise fee payments and not the tax equivalent/PILOT payments.
> (9) [*P]endente lite* payments shall continue to be paid by Bolivar. . .during the pendency of the appeal for up to twenty-four (24) months from the filing of the notice of appeal.
>
> *                    *                    *

(13) No prejudgment interest is warranted.

Bolivar filed a timely notice of appeal. However, upon review of the record, we determined that the order appealed was not final because, although the trial court entered an order approving the special master's report, that report was not incorporated by reference into the June 29, 2011 order. Consequently, judgment was not entered in the amounts specified in the special master's report. Upon remand, on January 9, 2012, the Chancellor entered judgment in favor of Middleton and Whiteville in the respective amounts calculated by the special master. The order is now final and appealable under Tennessee Rule of Appellate Procedure 3(a).

Bolivar raises five issues for review as stated in its brief; however, we perceive that there are three dispositive issues, which we state as follows:

> 1. Whether the trial court erred in ruling that the ordinances were contractual in nature and did not expire after the initial term of thirty years?
>
> 2. Whether the trial court erred in ruling that neither the RBL, nor the MGSTEL prohibited Bolivar from paying the 2% gross receipts payments for the privilege of franchising in Middleton and Whiteville.
>
> 3. Whether the trial court erred in granting Whiteville and Middleton *pendente lite* payments.[4]

---

[4] As a point of practice, we note that Tennessee Rule of Appellate Procedure 24(a) provides, in relevant part, that:

> The following papers filed in the trial court are excluded from the record: (1) subpoenas or summonses for any witness or for any defendant when there is an appearance for such defendant; (2) *all papers relating to discovery, including depositions, interrogatories and answers thereto*, reports of physical or mental examinations, requests to admit, *and all notices, motions or orders relating thereto*; (3) any list from which jurors are selected; and (4) trial briefs; and (5) minutes of opening and closing of court. Any paper relating to discovery and offered in evidence for any purpose shall be clearly identified and treated as an exhibit. *No paper need be included in the record more than once*.

*Id*. (emphasis added).

(continued...)

-12-

Before addressing the issues, we first note that our review of the trial court's findings of fact is *de novo*, accompanied by a presumption of correctness, unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. ***Watson v. Watson***, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005). Our review of the trial court's determinations regarding questions of law is *de novo* with no presumption of correctness. ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993); ***Bain v. Wells***, 936 S.W.2d 618, 622 (Tenn. 1997).

## Contractual Nature of Whiteville and Middleton Ordinances

Power of Municipality to Contract

A municipality can exercise only the powers expressly or impliedly conferred upon it in its charter or by statute. ***City of Lebanon v. Baird***, 756 S.W.2d 236 (Tenn.1988). There are various statutory schemes authorizing municipalities to operate different types of utilities and to issue bonds to finance these projects. For example, both the RBL, and the Local Government Obligations Law, Tennessee Code Annotated Section 9-21-101, *et seq.*, give a municipality the power to acquire and operate public works within or without the municipality.[5] Tennessee Code Annotated Section 7-34-102(2) defines a "municipality" as

---

[4](...continued)

This record contains several volumes, in large part due to the same papers being filed numerous times, the inclusion of discovery materials, and irrelevant portions of the transcripts being included in our record in direct contravention of the foregoing Rule of Appellate Procedure. The problem with inclusion of extraneous filings that are clearly excluded from the appellate record is that it places upon this Court a duty that falls to the Appellant—to prepare a correct and complete record on appeal. Tenn. R. App. P. 24(b). In making that record, the Appellant should adhere to the mandates contained in Tennessee Rule of Appellate Procedure 24(a). This Court endeavors to file its opinions in a timely manner; however, when placed in the position of having to review volumes of extraneous, unnecessary, and irrelevant filings, our goal is hindered and the interests of judicial economy are stymied.

[5] In enacting the RBL, the legislature noted that:

> The powers and authority conferred by this act shall be in addition and supplemental to, and the limitation imposed by this act shall not affect the powers conferred by any other general, special or local law or by any private act.

2003 Tenn. Pub. Acts, ch. 20, § 3; Tenn. Code Ann. § 7-34-118.

(continued...)

"any county or incorporated city or town of the state." Under Tennessee Code Annotated Section 7-34-102(3), "public works" is defined to include "gas or electric heat" systems. Similarly, Tenn. Code Ann. § 9-21-105 (22)(A) defines "public works project" to include "gas and natural gas systems." Specifically, Tenn. Code Ann. § 7-34-104(a) gives municipalities the power to:

> (2) Operate and maintain any public works for its own use or for the use and benefit of its inhabitants, and also operate and maintain such public works for the use and benefit of persons, firms, and corporations, including municipal corporations and inhabitants of municipal corporations whose residences or places of businesses are located outside the territorial boundaries of the municipality;
>
> \*       \*       \*
>
> (7) Contract with any person, municipality, the United States, the president of the United States, the Tennessee Valley Authority, and any and all other authorities, agencies, and instrumentalities of the United States, and, in connection with any such contract, stipulate and agree to such covenants, terms and conditions as the governing body may deem appropriate, including, but not limited to, covenants, terms and conditions with respect to the resale rates, financial and accounting methods, services, operation and maintenance practices, and the manner of disposition of the revenues of the public works, operated and maintained by the municipality[.]

Tenn. Code Ann. §§ 7-34-104(a)(2), (7). Similarly, Tennessee Code Annotated Section 9-21-107 gives all local governments the power and authority to:

> (1) Engage in the construction of any public works project which may be constructed within or without the local government, or partially within and partially without the local government. However, no local government shall engage in the construction of a public works project wholly or partly within the legal boundaries of another local government except with the consent of the governing body of the other local government; provided, that any county or metropolitan government may

------

[5](...continued)

construct a public works project within a municipality within the county or metropolitan government without the permission of the governing body of the municipality;

(2) Operate and maintain any public works project for its own purpose or for the benefit and use of its inhabitants and, in the case of municipalities, also to operate and maintain such public work projects for the benefit and use of the municipality and persons, firms and corporations therein and persons, firms and corporations, including municipal corporations, which are situated or whose residences or places of business are situated outside the territorial boundaries of the municipality but within the state and within a radius of twenty (20) miles from the territorial boundaries of the municipality[.]

Tenn. Code Ann. §§ 9-21-107(1), (2).[6]

The RBL gives municipalities broad authority to "[c]ontract with any . . . [other] municipality . . . and, in connection with any such contract, [to] stipulate and agree to such covenants, terms, and conditions as the governing body may deem appropriate[.]" Tenn. Code Ann. § 7-34-104(a)(7); 1935 Tenn. Pub. Acts ch. 33, § 4(6). Moreover, while the law expressly recognizes Bolivar's authority to operate its utility "outside [Bolivar's] territorial boundaries," and to exercise right-of-way on another municipality's streets for purposes of providing its services, Tenn. Code Ann. § 7-34-104(a)(2); 1935 Tenn. Pub. Acts ch. 34, § 4(2), it simultaneously conditions the exercise of Bolivar's ability to do so upon its securing the "consent . . . of the other municipality [i.e., Middleton and Whiteville]." Tenn. Code Ann. § 7-34-105; 1935 Tenn. Pub. Acts ch. 33, § 13; *see also* Tenn. Code Ann. § 7-34-104(a)(8) (stating that a municipal utility may "[u]se any right-of-way, easement or other similar property right necessary or convenient in connection with the acquisition, improvement, operation or maintenance of a public works, held by the state or any other political subdivision of the state; provided, that the governing body of such other political subdivision shall consent to such use").

---

[6] Apart from these statutory provisions, a municipality may be able to derive the authority to acquire and operate utility systems from powers granted in its charter. *Nashville Electric Service v. Luna*, 185 Tenn. 175, 204 S.W.2d 529 (Tenn. 1946); *Kennan & Wade v. City of Trenton*, 130 Tenn. 71, 168 S.W. 1053 (Tenn. 1914); *City of Memphis v. The Memphis Water Co.*, 52 Tenn. 495 (Tenn. 1871). Each of the statutory schemes discussed above provides that each is intended to be supplemental to powers conferred by other laws. Tenn. Code Ann. § 7-34-118; Tenn. Code Ann. § 7-35-432; Tenn. Code Ann. § 9-21-124.

Tennessee Code Annotated Section 6-19-101, states that a municipality's ordinance power extends to the making of contracts, and specifically to "[m]ake contracts . . . for public utilities and public services to be furnished the city." Tenn. Code Ann. § 6-19-101(13). Accordingly, ordinances, such as those at issue here, under which a municipality grants a utility a franchise to operate within the municipality, are contractual in nature. *See Lewis v. Nashville Gas & Heating Co.*, 40 S.W.2d 409 (Tenn. 1931). The RBL, at Tennessee Code Annotated Section 7-34-304 provides that: "[a]ny contract or contracts made by the municipalities under the authority conferred by [the RBL] shall be binding and obligatory upon the municipalities, respectively, and may be enforced against the municipalities, or either of the municipalities, as any other contract obligation might be enforced."

In *Lewis*, our Supreme Court addressed an ordinance, under which the City of Nashville granted a franchise to the Nashville Gas Company, allowing it to provide gas service to city residents. Although the dispositive issues addressed in *Lewis* are not the same as those presented in this appeal, several of the holdings in *Lewis* are, nonetheless, instructive to us. In *Lewis*, the Court held that a municipality's exercise of its right to contract "is not to be confused with the limited power of sovereignty delegated to municipal corporations." *Lewis,* 40 S.W.2d at 412. Rather, municipal corporations are "dual entities, possessing both corporate and limited governmental power." *Id*.; *see also Saulman v. City Council of Nashville*, 131 Tenn. 427, 175 S.W. 532, 534 (Tenn. 1916). Consequently, the *Lewis* Court held that, "[a]s an agency of the state, the municipality could exercise such governmental power as was delegated to it. As a corporate entity endowed with proprietary or corporate rights, it could, to a certain extent, contract." *Lewis,* 40 S.W.2d at 412 (citing *Omaha Water Co. v. Omaha* (C. C. A.) 147 F. 1, 12 L.R.A.N.S. 736, 8 Ann. Cas. 614 (8th Cir. 1906); *Illinois Trust & Savings Bank v. Arkansas City*, 76 F. 271, 34 L. R. A. 524 (8th Cir. 1896)). In *Lewis*, as in the instant case, the gas company's agreement to pay the city a percentage of receipts in consideration of the city's consent to let the company enter was "incorporated in [an] ordinance." *Id*. at 410. This ordinance was held to be a valid contract. *Id*. at 412 (holding that city's contract with gas company to receive percentage of receipts, in consideration of permitting company to enter, was not invalid or ultra vires).

Validity of the Ordinances

Bolivar's first argument is that the Whiteville and Middleton Ordinances are invalid either because they were not adopted under proper procedure, or because Bolivar did not "accept" the ordinances, in the sense that one must show "acceptance" of a contract in order to prove its validity. In the first instance, these arguments are disingenuous because Bolivar has operated under the franchise granted by the ordinances it now claims were void *ab intio* for more than half a century. No matter, we need not address this question as the issue was not raised in the trial court. It is well-settled that issues are considered waived on appeal by

the failure to present them at trial. *See ABN AMRO Mortg. Group, Inc. v. Southern Sec. Federal Credit Union*, No. W2011–00693–COA–R3CV, 2011 WL 5590320, at \*4 (Tenn. Ct. App. Nov. 17, 2011) (citing *Waters v. Farr*, 291 S.W.3d 873, 918 (Tenn. 2009)); *see also State v. Leach*, 148 S.W.3d 42, 55 (Tenn. 2003) (noting that it is well-settled that "a party may not litigate an issue on one ground, abandon that ground post-trial, and assert a new basis or ground on appeal"). Accordingly, we decline to address this argument. However, Bolivar did argue, in the trial court, that the ordinances' expiration relieved it from the obligation to make the 2% gross receipts payments. The trial court was not persuaded and held that the parties had operated under an implied contract since the expiration of the initial thirty year term. We now turn to review that holding.

Implied Contract

Having determined that the Whiteville and Middleton ordinances were in the nature of contracts between those towns and Bolivar, the plain language of the contracts indicates that the franchises established thereunder will run for thirty years. Accordingly, the Middleton Ordinance expired on April 24, 1983 and the Whiteville Ordinance expired on April 14, 1984. Based upon the undisputed fact that the parties continued to operate under the ordinances until 2007, when Bolivar ceased payment of the 2% gross receipts, the trial court concluded that an implied contract arose from the carryover in both circumstances.

The expiration of a municipal franchise by its own terms is a topic discussed in 12 Eugene McQuillin, A Treatise on the Law of Municipal Corporations (3rd ed.):

> Generally, upon the expiration of a municipal franchise granted to a public utility, there is no longer any contractual relationship between the municipality and the utility. An exception occurs, however, when the parties to a franchise agreement continue to perform after the expiration of the franchise in the same manner they did when the franchise was formally in effect.
> If a company continues to operate after its franchise has expired, it does so under an implied contract, cancelable upon reasonable notice, under the same terms and conditions as the franchise ordinance. . . .[W]here a public service company continues to operate its plant and render service after the expiration of its franchise, and the municipality continues to accept it as before expiration, the company, while so acting, is subject to the obligation growing out of such assumed quasi-public service, to the extent that it is required to supply

-17-

adequate service, to its reasonable capacity and at reasonable
rates, and to this extent becomes subject to the jurisdiction and
supervision of the courts to enforce such implied undertaking.
Similarly, a public utility may not continue to reap the benefits
of a franchise agreement after its expiration and be relieved of
the burdens of the same agreement.

*Id*. at § 34:69 (footnoted citations omitted); *see also* 36 Am. Jur. 2d Franchises from Public
Entities §§ 54 to 56 (2012). As a result, we conclude that the trial court did not err in
finding that, by virtue of the fact that the parties continued to operate under the ordinances
until 2007, the contractual relationships between these parties did not "expire" after the initial
thirty year period. Although we concede that Bolivar may have attempted, by its April 18,
2007 letter to Whiteville and Middleton, to modify or cancel its contractual obligation to pay
the 2% fees under the ordinance, Bolivar continued to operate its franchises in those towns.
Based upon the continuation of the contractual benefit, Bolivar could not relieve itself of the
contractual burden to pay for the franchise privilege.

As to whether Whiteville and Middleton had the authority to charge Bolivar a
franchise fee under the ordinances, it is well settled that "[a] municipal corporation may
impose a reasonable charge as compensation for the use of its streets." 64 C.J.S. Municipal
Corporations § 1904 (2012). Consequently, Whiteville and Middleton could impose a charge
to Bolivar for the privilege of using the towns' streets to service its utility customers in those
towns. Here, Bolivar continued to enjoy the franchise, but, after April 2007, refused to pay
for that privilege. "A public utility may not continue to reap the benefits of a franchise
agreement after its expiration and be relieved of the burdens of the same agreement."
McQuillin, at § 34:69. There is, however, an exception to this maxim.

In 1935, when the Tennessee legislature granted municipalities the power to own and
operate a utility system, it also exempted municipal utilities from all state regulation:

Be it further enacted, [t]hat neither the . . . Public Utilities
Commission [now referred to as the Tennessee Regulatory
Authority] nor any other board or commission of like character
hereafter created shall have jurisdiction over the municipality in
the management and control of any public works, including the
regulation and control of any public works, including the
regulation of the rates, fees, or charges.

1935 Tenn. Pub. Acts ch. 33, §17.[7]  Because municipal utilities are not regulated by state agency or the Tennessee Regulatory Authority, municipal utility revenues are governed by state statute, namely the RBL and the MGSTEL.  Accordingly, if a state statute prohibits a fee, such as the 2% gross receipts fee at issue here, then a municipality may not preempt the state law by ordinance or action:

> A municipal corporation may impose a reasonable charge as compensation for the space in its streets that is occupied by the operator of a public utility or for the use of its streets.  The state legislature may expressly authorize municipalities to exact a fee for the purpose of revenue from the use of their streets.  *The legislature, however, may prohibit such a fee or limit the amount that may be charged.  A municipal ordinance may be preempted by state law to preclude the charge of fees in excess of an authorized rate when such fees are unrelated to the reasonable costs of recouping expenses incurred by the municipality as a result of allowing access to its streets.*

64 C.J.S. Municipal Corporations § 1904 (emphasis added).  This leads us to the second issue concerning whether either the RBL or the MGSTEL prohibit Whiteville and Middleton from charging Bolivar 2% of its gross receipts for the privilege to franchise in those towns.

**Preclusion of 2% Gross Receipts Fee under RBL or MGSTEL**

Standard of Review

This question requires us to interpret and apply several statutory provisions of the

---

[7] The current codification is found at Section 7-34-106 of the RBL, which states:

> It shall not be necessary for any municipality proceeding under this chapter to obtain any certificate of convenience or necessity, franchise, license, permit, or other authorization from any bureau, board, commission or other like instrumentality of the state in order to acquire, construct, purchase, reconstruct, improve, better, extend, maintain and operate any public works.

RBL and the MGSTEL. These are questions of law, which we review *de novo* with no presumption of correctness. Tenn. R. App. P. 13(d). The Tennessee Supreme Court recently outlined the applicable principles that apply to the question of statutory interpretation:

> When dealing with statutory interpretation . . . our primary objective is to carry out legislative intent without broadening or restricting the statute beyond its intended scope. ***Houghton v. Aramark Educ. Res., Inc.***, 90 S.W.3d 676, 678 (Tenn. 2002). In construing legislative enactments, we presume that every word in a statute has meaning and purpose and should be given full effect if the obvious intention of the General Assembly is not violated by so doing. ***In re C.K.G.***, 173 S.W.3d 714, 722 (Tenn. 2005). When a statute is clear, we apply the plain meaning without complicating the task. ***Eastman Chem. Co. v. Johnson***, 151 S.W.3d 503, 507 (Tenn. 2004). Our obligation is simply to enforce the written language. ***Abels ex rel. Hunt v. Genie Indus., Inc.***, 202 S.W.3d 99, 102 (Tenn. 2006).

***Estate of French v. Stratford House***, 333 S.W.3d 546, 554 (Tenn. 2011). Furthermore, statutes that are part of a broad statutory scheme should be interpreted *in pari materia*, so as to make that scheme consistent in all its parts. ***Wells v. Tennessee Bd. of Regents***, 231 S.W.3d 912, 917 (Tenn. 2007); ***Lyons v. Rasar***, 872 S.W.2d 895, 897 (Tenn. 1994); ***State v. Allman***, 68 S.W.2d 478, 479 (Tenn. 1934). Courts are required to construe a statute, or set of statutes, "so that the component parts are consistent and reasonable." ***In re Sidney J.***, 313 S.W.3d 772, 775 (Tenn. 2010) (quoting ***Cohen v. Cohen***, 937 S.W.2d 823, 827 (Tenn. 1996)). We also have a duty to interpret a statute in a manner that makes no part inoperative. ***In re Sidney J.***, 313 S.W.3d at 775–76 (citing ***Tidwell v. Collins***, 522 S.W.2d 674, 676 (Tenn. 1975)).

Applicable Statutes and Relevant Statutory History

In addition to those provisions discussed above, as is relevant to the instant appeal, the RBL further provides, in relevant part:

**§ 7-34-103. Policy declaration.**

(a) It is declared to be the policy of this state that any municipality acquiring, purchasing, constructing, reconstructing, improving, bettering or extending any public works pursuant to this chapter shall manage such public works in the most efficient

manner consistent with sound economy and public advantage, to the end that the services of the public works shall be furnished to consumers at the lowest possible cost.

(b) No municipality shall operate public works for gain or profit or primarily as a source of revenue to the municipality, but shall operate public works for the use and benefit of the consumers served by the public works and for the promotion of the welfare and for the improvement of the health and safety of the inhabitants of the municipality.

(c) No use of revenues authorized by this chapter shall be construed as being contrary to the policy declared in this section.

Tenn. Code Ann. § 7-34-103.

Tennessee Code Annotated Section 7-34-115 lists permissible payments that may be made from utility revenues:

(a) Notwithstanding the provisions of any other law to the contrary, as a matter of public policy, municipal utility systems shall be operated on sound business principles as self-sufficient entities. User charges, rates and fees shall reflect the actual cost of providing the services rendered. No public works shall operate for gain or profit or as a source of revenue to a governmental entity, but shall operate for the use and benefit of the consumers served by such public works and for the improvement of the health and safety of the inhabitants of the area served. Nothing in this section shall preclude a municipality from subsidizing, in accordance with the adopted budget of the municipality, a public works system with tax revenues. Nothing in this section shall preclude a municipal utility system from operating water and sewer systems as individual or combined entities. Nothing in this section shall preclude a municipal utility system from operating a public works system as a special revenue fund when the governing body of the municipality determines that it is in the best interest of the customers of the public works system and the citizens of the municipality. . . . Any municipality shall devote all revenues derived from a public works to or for:

(1) The payment of all operating expenses;
(2) Bond interest and retirement or sinking fund payments, or both;

(3) The acquisition and improvement of public works;

(4) Contingencies;

(5) The payment of other obligations incurred in the operation and maintenance of the public works and the furnishing of services;

(6) The redemption and purchase of bonds, in which case such bonds shall be cancelled;

(7) The creation and maintenance of a cash working fund;

(8) The payment of an amount to the general fund of the municipality not to exceed a cumulative return of six percent (6%) per annum of any equity invested from the general fund, if any, of the municipality. Equity investment includes any contributions or purchases made by the municipality from the general fund, including, but not limited to, cash contributions, retirement of debt service and purchases of equipment, so long as these contributions are reflected in the utility's financial statement; provided, that such definition of equity investment shall not change the status under this section of any payments made pursuant to any provision of a city charter in existence on or before July 1, 1993; and

(9) If the governing body of the municipality by resolution so requests, payments to the municipality in lieu of ad valorem tax on the property of the public works within the corporate limits of the municipality not to exceed the amount of taxes payable on privately owned property of similar nature.

(b) Any surplus remaining, after establishment of proper reserves, if any, shall be devoted solely to the reduction of rates

This Court very recently discussed the amendments to the foregoing section of the RBL in *Morrison v. City of Bolivar*, No. W2011–01874–COA–R9–CV, 2012 WL 2151480 (Tenn. Ct. App. June 14, 2012):

The 1969 amendment allowed municipalities that had retired all bonds issued to devote surplus revenues to "any municipal purpose." 1969 Tenn. Pub. Acts. Ch. 335 §§ 2–3. Consequently, after 1969, it was acceptable for a municipal utility to devote surplus revenues to the municipality, rather than to devote those surplus revenues solely to the reduction of rates. . . .

The 1993 amendments [to the RBL, *see* 1993 Tenn. Pub. Acts. Ch. 509 § 1] closed the loophole that had allowed municipalities that had retired all bonds to devote surplus revenues to "any municipal purpose," and instead require that: "Any surplus remaining, after establishment of proper reserves, if any, shall be devoted solely to the reduction of rates." Tenn. Code Ann. § 7–34–115(b). The Senate debated this particular amendment on May 4, 1993. The transcript of the debate . . . provides, in relevant part, as follows:

> [Comptroller] Morgan: As it related to in lieu of taxes, I really don't think we're creating a problem, but we certainly don't intend to affect any of the other sections that provide for in lieu of tax payments. What happens is: The only thing we're changing that relates to payments from a utility to a general government is that we're just deleting the ability of a general government to reach into a utility and transfer surplus monies. Current law provides, the sections we're amending, that after the application of excess surpluses to a whole range of purposes, the final purpose is it can be used for any lawful municipal purpose. That's what the business tax study committee was quite concerned with, and that has been the mechanism by which utilities have been tapped to support general government operations. That is what this bill seeks to close, is that last purpose which would be any other municipal purpose that would be.

The Senate continued its debate on May 17, 1993, with Senator Henry stating, in relevant part, as follows:

> [Senator] Henry: Mr. Speaker, amendment n[umber] one by the State and Local Government committee is a rewrite of the bill and is set out in considerable detail the nature of the payments

-23-

which a municipality owned utility may make to its municipality. It provides that it can pay them for items one two three four and so forth, down, but anything over that has to be used for rate reduction and if a municipality violates this provision, puts too much in the general fund, does not use it for rate reductions it must repay the utility and therefore to the people who patronize the utility the amount improperly transferred to the general fund.

*Morrison*, 2012 WL 2151480, at \*3 and \*5 (quotes from legislative history taken from 1993 Tenn. Pub. Acts. Ch. 509 § 1).

Turning to the applicable provisions of the MGSTEL, the legislative intent governing that statutory scheme is set out at Tennessee Code Annotated Section 7-39-402:

The purpose of this part is to provide the complete law of this state with respect to payments in lieu of taxes on the property and operations of all gas systems owned and operated by incorporated cities or towns, by counties, and by metropolitan governments, and to repeal the specific provisions of any private act, home rule charter or metropolitan government charter, or any part of any private act, home rule charter or metropolitan government charter, relating to payments in lieu of taxes, except for provisions relating to the distribution of any such payments, but not to repeal any other provisions of such private acts or charters or parts of the private acts or charters. This part is remedial in nature and this part shall be liberally construed to effectuate the purpose of this part.

The MGSTEL governs PILOT payments as follows:

Notwithstanding any provision of law to the contrary in this code or in the provisions of any private act, every municipality may pay or cause to be paid from its gas system revenues for each fiscal year an amount for payments in lieu of taxes, referred to as "tax equivalents", on its gas system and gas operations, which, in the judgment of the municipality's governing body, shall represent the fair share cost of government properly to be

-24-

borne by the municipality, subject, however, to the following conditions and limitations:

(1) The total amount so paid as tax equivalents for each fiscal year shall not exceed a maximum amount equal to the sum of the following:

> (A) With respect to each of the respective taxing jurisdictions in which the municipality's gas system is located, the equalized property tax rate, determined as provided in this section, for the taxing jurisdiction as of the beginning of such fiscal year, multiplied by the net plant value of the gas system and the book value of materials and supplies within the taxing jurisdiction as of the beginning of such fiscal year, multiplied by the assessment ratio in effect as of the beginning of such fiscal year; and
> (B) Four percent (4%) of the average of revenue less cost of gas from gas operations for the preceding three (3) fiscal years;

(2) Such tax equivalent payments shall be made only from gas system revenues remaining after payment of, or making reasonable provision for payment of:

> (A) Current gas system operating expenses, including salaries, wages, cost of materials and supplies, power at wholesale, and insurance;
> (B) Current payments of interest on indebtedness incurred or assumed by a municipality for the acquisition, extension, or improvement of the gas system, and the payment of principal amounts of such indebtedness, including sinking fund payments, when due;
> (C) Reasonable reserves for renewals, replacements, and contingencies; and
> (D) Cash working capital adequate to cover operating expenses for a reasonable number of weeks;

(3) The total amount to be paid as tax equivalents for each fiscal year shall be in lieu of all state, county, city, and other local taxes or charges on the municipality's gas system and gas operations except as provided in subdivision (6);

(4) The total amount to be paid as tax equivalents, including that to be paid for the municipality and any other taxing jurisdiction, for each fiscal year, determined in accordance with and subject to this part, shall be set forth in a resolution adopted by the municipality's governing body after consultation with the supervisory body, if different from the governing body, and the municipality's gas system shall pay to the municipality and any other specified taxing jurisdictions amounts as provided in that resolution. Such determination shall be made as early in such fiscal year as possible and shall become final at the end of such year;

Tenn. Code Ann. § 7-39-404. The term "taxing jurisdiction," as used in Section 7-39-404 is defined as "any county, incorporated city or town, or metropolitan government in Tennessee having the power to levy taxes, or any special taxing district in Tennessee on behalf of which *ad valorem* property taxes may be levied, for the support of governmental and related activities and services." Tenn. Code Ann. § 7-39-403(11).

We note that the Tennessee legislature has very recently amended Tennessee Code Annotated Section 7-39-405, effective May 10, 2012, to read as follows:

SECTION 1. Tennessee Code Annotated, Section 7-39-405, is amended by designating the existing language as subsection (a) and by adding the following as subsection (b):

(b) Notwithstanding the provisions of any private act or home rule charter, or any part thereof, relating to the distribution of payments in lieu of taxes, unless a written agreement was executed prior to April 2012, or becomes effective on the first day of any fiscal year thereafter, by another taxing jurisdiction and:

(1) A municipality,
(2) Located in any county having a charter form of government;

(3) That owns and operates a gas system,

and such written agreement provides for a different payment, then each taxing jurisdiction shall receive a payment that is equal to that portion of the total tax equivalent payment that is calculated using each such taxing jurisdiction's tax rate pursuant to § 7-39-404(1)(A).[8]

2012 Tenn. Laws Pub. Ch. 984 (SB1165, HB1376).

Whether the RBL and MGSTEL apply to Bolivar and to Whiteville and Middleton

Before applying the foregoing statutes, we must first determine whether the RBL and the MGSTEL apply equally, or at all, to both Bolivar (as the operator of a municipal utility) and to Whiteville and Middleton (as the municipalities being serviced by BGC). We conclude that the answer to this question lies in the respective definitions of "municipality" given by each of the statutory schemes.

The MGSTEL's definition of "municipality" differs slightly from the RBL's definition, discussed *supra*. While the RBL defines a "municipality" broadly as "any county or incorporated city or town of the state," Tenn. Code Ann. §7-34-102(2), the MGSTEL's definition is more specific. For purposes of the MGSTEL, a "municipality" "means any incorporated city or town, metropolitan government, or county that now or hereafter owns and operates a gas system." Tenn. Code Ann. §7-39-403(11). This distinction is important because it gives the RBL broader application, i.e., it is applicable to "**any** . . . incorporated city or town . . . ." On the other hand, the MGSTEL is applicable only to those incorporated towns that "own[] or operate[] a gas system." In the context of this case, that means that the RBL's references to a municipality may apply to Whiteville, Middleton, **and/or** to Bolivar,[9]

_____

[8] Before the May 10, 2012 amendment, Tennessee Code Annotated Section 7-39-504 read:

The municipality's governing body, in the resolution provided for in § 7-39-404(4), shall direct payment of the amounts to be paid as tax equivalents to the taxing jurisdictions in which its gas plant in service is located in accordance with and subject to any terms, conditions, contracts or agreements now in effect.

[9] As will be discussed *infra* not every mention of a "municipality" in the RBL will refer to Whiteville, Middleton **and** Bolivar. Rather, depending upon the context of the usage, "municipality" may refer only to Bolivar or only to Whiteville and Middleton. We make the distinction only to clarify the fact
(continued...)

-27-

whereas the MGSTEL's use of "muncipality" applies only to Bolivar (as the town operating the BGC). Under the MGSTEL, Whiteville and Middleton qualify only as "taxing jurisdiction[s]."

### Distinction between PILOT and Franchise Fees

Some of Bolivar's arguments concerning whether it should be required to pay the 2% gross receipts fee for the franchise rights granted by Whiteville and Middleton rest upon a determination of whether the fees contemplated under the ordinances are the same as PILOT. We conclude that they are not.

In her letter of August 15, 2006, Melissa Ashburn, Legal Consultant with the MTAS, first opined that "payments made under a franchise agreement are different than payments made in lieu of taxes." Ms. Ashburn's opinion was based, in part, upon a Tennessee Attorney General's opinion wherein the Attorney General addressed, *inter alia*, the question of whether "gross receipts tax on the earnings of public utility companies operating in Tennessee [could] be substituted for the present system of property taxation of utilities, involving valuation and assessment at the state level." 1983 Op. Tenn. Att'y Gen. No. 83-127. The Attorney General found that gross receipts taxes on earnings were not the same as PILOT, which were based upon valuation of property. Accordingly, the Attorney General concluded that a gross receipts tax may not be substituted for property taxation of public utility companies, since Article II, section 28, of the Tennessee Constitution requires all property to be taxed according to its value.[10]

---

[9](...continued)
that, while Whiteville and Middleton **may** be considered municipalities under the RBL, they may only be considered "taxing jurisdicitions" under the MGSTEL's definition of "municipality."

[10] The Attorney General's opinion specifically states:

> Currently in Tennessee, the property of public utility companies is valued and assessed at the state level, with subsequent imposition by cities and counties of their local tax rate to property within their boundaries. The instant proposal is to replace this system of property taxation of utilities with a gross receipts tax on their earnings. This proposal immediately runs afoul of Article II, section 28, of the Tennessee Constitution. The Constitution clearly contemplates that all property in Tennessee will be taxed on the basis of its value. Thus, the legislature cannot exempt utilities, or any other companies or persons, from property taxation unless they come within the exceptions plainly stated in the Constitution.

(continued...)

36 Am. Jur. 2d Franchises from Public Entities § 1 (2012) states that:

> The term "franchise" designates a right or privilege conferred by law for the provision of some public purpose or service, which cannot be exercised without the express permission of the sovereign power, such as by a legislative grant.
>
> A franchise constitutes a private property right. Similarly stated, a "franchise" is the special privilege awarded by government to a person or corporation and conveys a valuable property right. To be a "franchise," the right possessed must be such as cannot be exercised without the express permission of the sovereign power. It is a privilege conferred by the government on an individual or a corporation to do that which does not belong to the citizens of the country generally by common right.

---

[10](...continued)

> Article II, section 28, declares that 'all property real, personal or mixed shall be subject to taxation . . . .' It goes on to permit exemption of property used exclusively for religious, charitable, scientific, literary, educational, or public purposes, none of which could conceivably include the property of utility companies. It further provides that the various classes of real and personal property shall be assessed at certain percentages of their value. This constitutional provision, which resulted from the celebrated 1972 'Question Three' amendment, additionally states,
>
> The ratio of assessment to value of property in each class or subclass shall be equal and uniform throughout the State, the value and definition of property in each class or subclass to be ascertained in such manner as the Legislature shall direct. Each respective taxing authority shall apply the same tax rate to all property within its jurisdiction.
>
> Thus, it is very clear that public utility property must be taxed under the general property tax in Tennessee; and it must be taxed according to its value. The instant proposal would not do so, but instead would levy a gross receipts tax on earnings of public utility companies. While the legislature may levy such a gross receipts tax if it so desires, it cannot eliminate property taxation of public utilities. Thus, the instant proposal is clearly unconstitutional.

1983 Op. Tenn. Att'y Gen. No. 83-127.

*Id*. (footnotes omitted).  The rights granted to Bolivar by Whiteville and Middleton give BGC a special "right or privilege" to provide utility service to Whiteville and Middleton consumers, and specifically grant Bolivar the use of Whiteville and Middleton roads and streets for that purpose.  Accordingly, the Whiteville and Middleton ordinances grant a franchise; as discussed above, Whiteville and Middleton may charge Bolivar a reasonable fee for this privilege.  This "franchise fee," however, which is based only upon the grant of a right, cannot be considered an *ad valorem* tax (a/k/a PILOT), which is based upon the value of the BGC's property lying within Whiteville and Middleton's respective territories.  This distinction was discussed in 64 C.J.S. Municipal Corporations § 1904 (2012):

> The charge for the occupation of a municipality's streets has been considered to be in the nature of a rental and not a tax. While the view has been taken that the power under which the city may collect such compensation is the police power, there is authority for the view that the fixing of a charge for the occupation of the street is not the exercise of any governmental power but is the exercise of the proprietary power of the municipality.

*Id*. (footnotes omitted).  Here, Bolivar accounted for the 2% gross receipts payments as "rent."  Now, Bolivar asserts that these rents are in lieu of the PILOT they may owe to Whiteville and Middleton.  We respectfully disagree.  No matter the nomenclature, the fees/taxes/rents for the franchise privilege are not the same as PILOT:

> A tax measured by a percentage of the gross receipts of corporations engaged in the business of selling or furnishing gas is regarded as a privilege or occupation tax and not a tax on the property of the corporation.

84 C.J.S. Taxation § 202 (2012) (footnotes omitted).  The distinction between various types of taxes and fees is important because,

> [e]xcept as and to the extent that the rules are changed or modified by statute, gas companies are subject to taxation in the same manner as other corporations or individuals.  A gas company is taxable, according to the laws of the particular state, on its franchise, on its capital and surplus or undivided profits, and on its physical property. As to physical property, gas pipes and mains laid under the streets are generally assessable as real estate.

*Id*. (footnotes omitted). The result is that, unless the RBL, the MGSTEL, or other statutory provisions preclude BGC from paying both a tax for the privilege of its franchises, and PILOT based upon the value of its property located in Whiteville and Middleton, then it may be charged for both. Accordingly, we begin with the proposition that Bolivar may be liable for both the franchise fees under the ordinances and for PILOT to Whiteville and Middleton under the MGSTEL, and turn to address Bolivar's arguments that the RBL and/or the MGSTEL preclude the payment of franchise fees.

RBL

Bolivar first argues that the 2% gross receipts provisions in the ordinances do not reflect the "actual expenses" incurred by Whiteville and Middleton on behalf of the utility. Tenn. Code Ann. § 7-34-115(a) (stating that "rates and fees shall reflect the actual cost of providing services rendered"). Accordingly, Bolivar contends that the imposition of the 2% gross receipts fee serves "for gain, profit, or primarily as a source of revenue to Whiteville and Middleton," in contravention of the RBL's policy declaration that the utility will be operated "in the most efficient manner consistent with sound economy and public advantage, to the end that the services of the public works shall be furnished to consumers at the lowest possible cost." Tenn. Code Ann. §§ 7-34-103(a), (b); Tenn. Code Ann. § 7 -34-115(a). The policy declaration of the RBL goes on to state, however, that "[n]o use of revenues authorized by this chapter shall be construed as being contrary to the [RBL] policy." Tenn. Code Ann. § 7-34-103 (c).

The distribution of utility revenues is governed by Tennessee Code Annotated Section 7-34-115, which is set out in full context above. In its brief, Bolivar argues that any surplus revenues generated by a utility "must be devoted solely to the reduction of rates and not used to support general government operations [i.e., the operations of Whiteville and Middleton]. While Bolivar's reading of Section 7-34-115(b) is technically correct in that a utility is obligated to use its "surplus" to reduce consumer rates, this reading presupposes that the 2% gross revenue fees are payments from a surplus. Under Section 7-34-115(a), before a utility may consider its funds to be "surplus," it must first satisfy the nine categories of payments allowed under the RBL, e.g. "all operating expenses," costs of "acquisition and improvement of public works," "payment of other obligations incurred in operating and maintenance of the [utility] and the furnishing of service." Tenn. Code Ann. §§ 7-34-115(a)(1), (3), (5). The utility is also obligated to create and maintain "a cash working fund." Tenn. Code Ann. § 7-34-115(a)(7). Sections 7-34-115(a)(8) and (9) address authorized payments a utility may make to **its municipality** (i.e., to the municipality operating the utility, here, Bolivar). Section 7-34-115(a)(8) allows a utility to repay monies taken from the municipality's general fund to fund the utility as "equity investment," with interest not to "exceed a cumulative return of six (6%) per annum." Although Middleton and Whiteville may be considered to

-31-

be municipalities, under the RBL, it is clear that the provisions of Section 7-34-115 apply to a utility (i.e., BGC) and to its governing municipality (i.e., Bolivar) Thus, the provision, at Section 7-34-115(a)(9), allowing the "governing body of the municipality by resolution" to request "payments to the municipality in lieu of *ad valorem* tax on the property of the public works within the corporate limits," refers to Bolivar's authority to charge BGC PILOT, but does not impede BGC's obligation or ability to also pay PILOT to other municipalities it serves, such as Whiteville and Middleton. Consequently, the RBL, in furtherance of its policy to promote sound business operation of municipal utilities and the goal of providing the lowest possible rate to consumers has given the utility autonomy, within the parameters set by Tennessee Code Annotated Section 7-34-115, to determine how it will spend its revenues. As we stated in ***Morrison***:

> The [RBL] does not contemplate that these funds [i.e., revenues generated by the utility] will automatically be used to reduce rates. Rather, Tennessee Code Annotated Section 7-24-115(a) lists several appropriate options for use of utility revenues. Only when these criteria are satisfied and the utility has adequate reserves, is it required to apply surplus funds to reduce rates. In short . . . it is the utility's decision how it will apply those funds to the expenses, contingencies, improvements, etc. set out in Subsection (a) of Tennessee Code Annotated Section 7-34-115.

***Morrison***, 2012 WL 2151480, at *7. The 1993 amendments simply closed the loophole that had allowed a utility to devote any surplus to "any municipal purpose," and instead required the utility to use any surplus to reduce consumer rates. Tenn. Code Ann. § 7-34-115(b). A utility, however, does not have surplus unless and until it has satisfied all of its operating, contractual, and reserve obligations as contemplated under Tennessee Code Annotated Section 7-34-115(a)(1) through (9). Based upon the foregoing, we hold that the franchise fees contemplated under the ordinances in this case qualify as either "operating" or "contractual" obligations of BGC.

Concerning PILOT payments, the legislative history set out above, i.e., the comments of Senator Henry and Comptroller Morgan, demonstrate that the Legislature, in amending Section 7-34-115 of the RBL, was only concerned with ensuring that a municipally owned utility was not used as a source of revenue to the municipality operating that utility. At the May 17, 1993 debate, Senator Henry stated that the goal of the amendments is to "set out in considerable detail the nature of the payments which a municipality owned utility may make to **its municipality**." (emphasis added). The Sponsor of the 1993 bill, Representative Matt Kisber, speaking to the Budget Subcommittee of the House Finance, Ways and Means Committee, on May 17, 1993, indicated that the amendment was based upon the Business

Tax Committee learning that "there were a few municipalities that were using **their utilities** to finance **their** local government." As stated by Comptroller Morgan, "we're just deleting the ability of a general government to reach into a utility and transfer surplus monies." From our review of the entire legislative history, we conclude that the 1993 amendments did not usurp a municipality's broad authority to contract with other municipalities. Tenn. Code Ann. § 7-34-104(a). The amendments did not infringe on BGC's ability to expand its operations into Whiteville and Middleton, once it received consent from those towns. Tenn. Code Ann. § 7-34-105; 1935 Tenn. Pub. Acts ch. 33, § 13; Tenn. Code Ann. § 7-34-104(a)(8). The amendments did not take away Whiteville and Middleton's right to be compensated for the grant of franchise rights to Bolivar, nor did the amendments relieve Bolivar of any contractual obligation to pay those fees.

Franchise fees are not in the nature of PILOT payments. The legislature is presumed to know the state of the law. *See, e.g., **In re Estate of Davis***, 308 S.W.3d 832, 842 (Tenn. 2010) (noting that the General Assembly "is presumed to know the state of the law on the subject under consideration at the time it enacts legislation." (internal citations omitted); ***Biscan v. Brown***, 160 S.W.3d 462, 476 (Tenn. 2004) ("The legislature . . . is presumed to know. . .the state of the law." (citation omitted)); ***State v. Powers***, 101 S.W.3d 383, 394 (Tenn. 2003) ("The legislature is presumed to know the state of existing case law." (citation omitted)). During the evolution of the RBL, cases were decided where two municipalities would contract for the payment of franchise fees. *See, e.g., **Nashville Gas & Heating Co. v. Nashville***, 152 S.W.2d 229, 233 (Tenn. 1941) ("One of the conditions which a municipal corporation can lawfully attach to the grant of a franchise is the payment of money[,]" which "may be a . . .sum arbitrarily selected, and if the [franchise] does not wish to pay it[,] it need not accept the franchise." (internal citations omitted)); ***Lewis v. Nashville Gas & Heating Co***, 40 S.W.2d 409 (Tenn. 1931). As noted above, the  franchise payments, at issue here, are in the nature of "operating expenses," i.e., the cost of doing business with other municipalities. They are separate and distinct from any PILOT payments calculated on a utility's **property**. We find nothing from which to conclude that the amendments to the RBL relieved Bolivar of any obligation it might have to pay PILOT to its operating municipality (i.e., Bolivar), or to any other municipal taxing jurisdictions under the MGSTEL, as discussed below. If the Legislature had intended otherwise, it would have made such prohibition clear in its amendments to the RBL. *See **Nashville Gas & Heating Co.***, 152 S.W.2d at 232 ("If it was the intention of the Legislature to refer to this special contractual obligation, created by voluntary agreement [i.e., the payment of franchise fees], it would seem that more apt words would have been employed.")[11] Rather, as stated by Comptroller

_____

[11] We are cognizant of the fact that ***Nashville Gas & Heating*** involved privately-owned utilities, whereas the instant case is concerned with a municipal utility. The distinction between Bolivar's

(continued...)

-33-

Morgan:

> As it related to in lieu of taxes, I really don't think we're
> creating a problem, but we certainly don't intend to affect any
> of the other sections that provide for in lieu of tax payments.

Some of these "other sections that provide for in lieu of tax payments" are set out in the MGSTEL. Having determined that the RBL does not prohibit the payment of the 2% gross receipts franchise fees, we now turn to address whether the MGSTEL contains such a prohibition.

## MGSTEL

From our reading of Bolivar's brief, it appears that its argument under the MGSTEL rests upon the premise that the MGSTEL operates to impair the contractual authority granted under the RBL. Accordingly, Bolivar contends that the MGSTEL prohibits it from paying the franchise fees. It is important to note, at the outset, that the provisions of the MGSTEL were in full force and effect more than six years before the Legislature acted to amend the RBL in 1993. Consequently, we must assume that the Legislature, in amending the RBL, was fully aware of the provisions of the MGSTEL, and that it was not the Legislature's intent to negate any authority granted under the MGSTEL in the absence of specific and clear intention in the language of the amendments. Tenn. Code Ann. § 7-34-118 ("The powers conferred by [the RBL] shall be in addition and supplemental to, and the limitations imposed by this chapter shall not affect, the powers conferred by any other general, special or local law."). With this in mind, we find nothing in the MGSTEL to indicate a legislative intent to forbid Bolivar from contracting to pay franchise fees to any taxing jurisdiction serviced by its utility. As stated in the declaration of policy portion of the MGSTEL, Tennessee Code Annotated Section 7-39-403, the purpose of the MGSTEL is "to provide the complete law . . . with respect to the payments in lieu of taxes on the property and operations of all gas systems owned and operated by incorporated cities . . . ." As discussed in detail above, the use of the term "municipality," in the MGSTEL refers only to Bolivar. With this in mind, we next consider Section 7-39-404 of the MGSTEL, which specifically addresses the payment of PILOT.

Section 7-39-404 states that "every municipality [i.e., Bolivar] may pay or cause to be paid from its gas system revenues [i.e., BGC's revenues] . . . 'tax equivalents.'" Under the RBL, Tennessee Code Annotated Section 7-34-115(a)(9), a municipality that is operating a

---

[11](...continued)
municipally-owned utility and a privately-owned utility does not infringe the applicability of those portions of the *Nashville Gas* case discussed herein.

gas company may take PILOT, in amounts contemplated by the MGSTEL, from its own utility. The MGSTEL, however, does not limit the payment of PILOT by a utility only to that utility's operating municipality (i.e., Bolivar). Rather, the MGSTEL, at Section 7-39-404(1), contemplates that, in addition to PILOT made to its operating municipality, a gas utility may also make PILOT to taxing jurisdictions [i.e., Whiteville and Middleton]. The MGSTEL provides that the tax rate for PILOT made to taxing jurisdictions is to be the "equalized property tax rate . . . multiplied by the net plan value of the gas system and the book value of **materials and supplies within the taxing jurisdiction**." However, the MGSTEL, like the RBL, requires the payment of certain enumerated obligations that may arise from operation of the gas utility prior to the payment of PILOT. Tenn. Code Ann. § 7-39-404(2). Thus, the utility cannot make PILOT to either its own municipality, or to its taxing districts, unless and until it has satisfied its "operating expenses," and "current payments of interest on indebtedness." Tenn. Code Ann. §§ 7-39-404(2)(A) and (B). Before making PILOT, the utility must also set up "reserves for renewals, replacements, and contingencies," and must maintain "[c]ash working capital adequate to cover operating expenses . . . ." Tenn. Code Ann. §§ 7-39-404(2)(C), (D). The MGSTEL's policy is not in contravention of similar provisions in the RBL (Tenn. Code Ann. § 7-34-115(a)); rather, the MGSTEL also works to further the implementation of sound business principals upon utilities and the municipalities that operate those utilities. The MGSTEL's mandate that "the total amount to be paid as tax equivalents for each fiscal year shall be in lieu of all state, city, and other local taxes or charges on a municipality 's gas system . . . ," does not bear upon the gas company's authority to pay franchise fees, which, as discussed above, are not in the nature of property taxes. Consequently, the ordinances do not set the PILOT payments as asserted by Bolivar. The payments contemplated under the ordinances are simply franchise fees (or operating expenses) paid by BGC for the privilege of operating a utility in Whiteville and Middleton. They are not "rate-making schemes," as asserted by Bolivar. As such, the ordinances do not qualify as "written agreement[s]," "relating to the distribution of payments in lieu of taxes," Tennessee Code Annotated Section 7-39-504, and thus the ordinances do not effect BGC's obligation to pay PILOT to its taxing jurisdictions under the MGSTEL, Tennessee Code Annotated Section 7-39-404(1)(A).

During the pendency of this litigation, Bolivar passed ordinances, resolving to pay Middleton and Whiteville PILOT under the MGSTEL model. This action was not in contravention of the MGSTEL and, in fact, was in furtherance of Bolivar's obligations under the MGSTEL. Tennessee Code Annotated Section 7-39-404(4) indicates that PILOT to both the municipality and to taxing jurisdictions made under the MGSTEL, "shall be set forth in a resolution adopted by the municipality's [i.e., Bolivar's] governing body . . . ." As amended, effective May 10, 2012, Tennessee Code Annotated Section 7-39-504 provides that the taxing jurisdictions of Whiteville and Middleton "shall receive a payment [i.e., PILOT] that is equal to that portion of the total tax equivalent payment using each such taxing

-35-

jurisdiction's tax rate pursuant to § 7-39-404(1)(A)."

The result is that, neither the RBL, nor the MGSTEL prohibit Bolivar from contracting to franchise with Whiteville and Middleton. Moreover, Whiteville and Middleton are entitled to compensation in the form of a franchise fee payment. Because the payment of a franchise fee is in the nature of a rental or operating expense and is not in the nature of an *ad valorem* tax, it is clear that the ordinances at issue here are not related "to the distribution of payments in lieu of taxes." As such, the contractual obligations assumed under these ordinances do not replace or usurp any PILOT due under the MGSTEL unless and until the contracts are amended or otherwise terminated. Without taxing the length of this opinion further by outlining the mechanism by which franchise contracts may be modified or terminated, suffice to say that the instant record does not establish that such modification or termination of the ordinances was achieved by Bolivar's unilateral decision to stop paying the franchise fees. *Cf.* 12 McQuillin Treatise on the Law of Municipal Corporations § 34:69.

Rates Charged to Whiteville and/or Middleton Consumers under the Ordinances

Under the amended MGSTEL, Tennessee Code Annotated Section 7-39-504, and as discussed above, the taxing jurisdictions are owed PILOT (so long as BGC has satisfied the operating expense requirements at Section 7-39-404), *but see* discussion below of exception for written agreements entered before April 2012. Bolivar argues that the payment of 2% of its gross revenues to Whiteville and Middleton for franchise rights fixes rates in violation of the MGSTEL. We respectfully disagree. From our reading of the ordinances, these particular provisions only address the grant and compensation for Bolivar's right to franchise in Whiteville and Middleton. Both the Middleton Ordinance and the Whiteville Ordinance provide that "**in consideration for these benefits** [i.e., to franchise in Middleton and Whtieville], [Bolivar] shall pay to [Middleon and Whiteville], 2% of the Domestic and Commercial Gross Receipts collected from the gas system in Middleton . . . ." These are franchise fees only, and do not fix the rates paid by Whiteville and Middleton customers.

The Middleton Ordinance further provides that Bolivar "may charge, **for gas** furnished by it, a rate which may not exceed by 2% the rates applicable to consumers inside the Town of Bolivar." The Whiteville Ordinance provides that Bolivar "shall be entitled to charge, for the gas furnished by it, a rate which may not exceed the rates applicable to consumers inside the City of Bolivar. . . ." These provisions are plainly rate provisions. Tennessee Code Annotated Section 7-24-115(a) of the RBL states that "[u]ser charges, rates and fees shall reflect the actual cost of providing the services rendered." Because the franchise fees contemplated under the ordinances are charged as a fee for the privilege of "providing services" to Whiteville and Middleton customers, they are "actual cost[s]"

-36-

incurred by BGC.   Because Whiteville and Middleton have a right to be compensated for allowing Bolivar its franchise, we cannot go so far as to adopt Bolivar's argument that the collection of these fees results in Whiteville and Middleon using BGC for "gain or profit or as a source of revenue."  Pursuant to Tennessee Code Annotated Section 7-34-108, BGC is allowed to, and in fact must, charge for services rendered to its customers, but that rate must be commensurate with rates charged to other similarly situated customers:

> Charges shall be made for any service rendered by a public works to a municipality or to any department or works of the municipality, at the rate applicable to other customers taking service under similar conditions . . . .

Tenn. Code Ann. § 7-34-108.  To the extent that the ordinances hinder BGC's ability to exercise its right to charge for actual services rendered, these ordinance provisions would be negated by the RBL or the MGSTEL.  Tenn. Code Ann. §7-39-402.  Reviewing the respective rate provisions in the ordinances, it is clear that the Middleton Ordinance allows BCG to charge the 2% franchise fee against the base rates for the gas sold in Middleton. This provision, therefore, allows BGC to charge Middleton customers for the actual cost of the provision of gas to those consumers, i.e., Middleton customers may bear the actual cost of BGC having a franchise to service them.  However, the Whiteville Ordinance indicates that BGC may not charge Whiteville customers more than it charges customers living inside the city of Bolivar.  By this provision, the Whiteville Ordinance ostensibly hinders the ability of BGC to charge Whiteville customers for the actual costs of providing them gas, which costs would include the franchise fee. Therefore, to the extent that the Whiteville Ordinance usurps BGC's right to charge its customers actual costs of services, it is invalid. Consequently, the Middleton Ordinance allows BGC to charge Middleton consumers 2% above the base rate it charges for its own municipality's  (i.e., Bolivar's) consumers.  The Whiteville Ordinance does not allow BGC to charge Whiteville customers the 2% franchise fee because that ordinance limits the rate that BGC can charge to Whiteville customers to the rate charged to Bolivar customers (where BGC pays no franchise fee to operate in Bolivar). In so doing, the Whiteville Ordinance usurps BGC's ability to charge Whiteville customers for BGC's "actual costs" of providing gas service in Whiteville.  Because such a prohibition is against the policy of the MGSTEL, we conclude that, to the extent the Whiteville Ordinance stops BGC from charging "actual costs," it is invalid.  Our holding, however, does not negate the entire contract between Whiteville and Bolivar, but only that rate provision that contradicts the MGSTEL.  Although we do not reach the issue of how this holding may bear upon the monies that may be owed or recovered by these parties, this determination does not preclude the trial court, upon remand, from addressing these questions.

Our conclusion above that Bolivar is liable for franchise fees payments to Whiteville and Middleton in the amount of 2% of its gross revenues in those towns, and our conclusion

that these charges may be passed on to the Whiteville and Middleton customers as "actual costs" of gas service, does not negate Bolivar's obligation to pay PILOT to its taxing jurisdictions (i.e., Middleton and Whiteville) under the MGSTEL and does not otherwise dictate how BGC may calculate PILOT due either to its municipality or to its taxing jurisdictions. Thus, the ordinances provide for the payment of 2% gross receipts as franchise fees; the ordinances also provide the rates applicable to consumers in Whiteville and Middleton, which provisions would be void insofar as they conflict with BCG's right to charge for its services. However, from our reading, the ordinances enacted by Whiteville and Middleton do not address PILOT payments due under the MGSTEL except to the extent that Bolivar is specifically granted "exemption from all taxes and assessments," for the duration of the franchise. Tennessee Code Annotated Section 7-39-405, as amended, allows a municipality and a taxing jurisdiction to agree in a written agreement executed prior to April 2012 for PILOT payments "different" from those contemplated in the MGSTEL. Therefore, the ordinances were not invalidated by the MGSTEL insofar as they allowed Bolivar an exemption from "any taxes and assessments," which we would read broadly to include PILOT owed to Whiteville and Middleton under the MGSTEL. However, Bolivar has now passed separate ordinances resolving to pay Whiteville and Middleton PILOT. By this action, Bolivar ostensibly waived the exemption from "any taxes" that it was granted under the ordinances. This was Bolivar's right to waive, and we will not disturb the passage of those resolutions to pay PILOT as they are not in contravention of the MGSTEL. These resolutions, however, affect only the provisions of the ordinances that granted Bolivar and exemption for "any taxes." The resolutions do not invalidate the ordinances in their entirety, and specifically do not negate the franchise fee obligations under the contract. As the record now stands, Bolivar must pay both the PILOT it resolved to pay to Whiteville and Middleton, and must make those PILOT in the amounts contemplated under the MGSTEL. In addition, under its remaining contractual obligations under the ordinances, Bolivar was never relieved of its contractual obligations to pay franchise fees of 2% of the gross revenues received by its utility in Whiteville and Bolivar, nor has the contract currently been amended or nullified so as to relieve Bolivar of this obligation going forward. However, to the extent that the rate provisions of the ordinances conflict with Bolivar's statutory obligation to reflect "actual costs" in its rates and its statutory right to charge the customers for those operating expenses, including the franchise fee, the ordinance provisions concerning the rates charged to Whiteville customers are rendered void, or otherwise unenforceable, by the provisions of the RBL and the MGSTEL. Tenn. Code Ann. § 7-39-406. Our holding does not preclude the trial court from addressing the effect, if any, of rates charged or received under the invalid provisions of the Whiteville Ordinance.

### *Pendente Lite* **Payments**
Having determined that Whiteville and Middleton are entitled to payment of the 2% gross receipts as franchise fees, we now turn to address whether the trial court erred in

ordering Bolivar to make payments during the pendency of this appeal. Bolivar's argument is based upon an allegation that the trial court's March 31, 2009 order is invalid because it did not make findings of fact as required before ordering Bolivar to make these *pendente lite* payments.

Tennessee Rule of Civil Procedure 65.04 addresses temporary injunctions and provides, in pertinent part, as follows:

> (2) **When Authorized**. A temporary injunction may be granted during the pendency of an action if it is clearly shown by verified complaint, affidavit or other evidence that the movant's rights are being or will be violated by an adverse party and the movant will suffer immediate and irreparable injury, loss or damage pending a final judgment in the action, or that the acts or omissions of the adverse party will tend to render such final judgment ineffectual.

If a court determines that the criteria in Subsection (2) above exist, then Rule 65.02 states that, "the court shall set forth findings of fact and conclusions of law which constitute the grounds of its action as required by Rule 52.01." Tenn. R. Civ. P. 65.04(6). There is no question that the trial court's March 31, 2009 order failed to make the requisite findings of fact, and included only the trial court's conclusions of law. In their brief, Whiteville and Middleton contend that Bolivar's lawyer prepared the order and, consequently, Bolivar cannot now complain that the order was fatally flawed. In the first instance, this argument is unpersuasive as it is incumbent upon the court, and not the parties, to ensure that its orders comply with applicable rules of procedure. Generally, the appropriate remedy when a trial court fails to make appropriate findings of fact and conclusions of law pursuant to Rule 52.01 is to "vacate the trial court's judgment and remand the cause to the trial court for written findings of fact and conclusions of law." *Lake v. Haynes*, No. W2010–00294–COA–R3–CV, 2011 WL 2361563, at *1 (Tenn. Ct. App. June 9, 2011). However, this Court has previously held that when faced with a trial court's failure to make specific findings, the appellate courts may "soldier on" when the case involves only a clear legal issue, *Burse v. Hicks*, No. W2007–02848–COA–R3–CV, 2008 WL 4414718, at *2 (Tenn. Ct. App. Sept. 30, 2008), or when the court's decision is "readily ascertainable." *Burgess v. Kone, Inc.*, No. M2007–0259–COA–R3–CV, 2008 WL 2796409, at * (Tenn. Ct. App. July 18, 2008). Thus, the fact that the trial court failed to ensure the inclusion of findings of fact in this order is not, necessarily, fatal to our review of the underlying decision. In this case, the court's decision to award Whiteville and Middleton *pendente lite* payments necessarily rests on the court's underlying determination that Whiteville and Middleton are entitled to the 2% franchise fees. Therefore, the basis for the trial court's decision to award *pendente lite* payments is "readily ascertainable." Consequently, we may "soldier on" to consider whether the trial court erred in ordering such payments.

When the trial court makes no specific findings of fact, there is nothing in the record upon which the presumption of correctness contained in Tennessee Rule of Appellate Procedure 13(d) can attach, appellate courts may review the record, *de novo*, without employing the presumption of correctness. *See **Nashville Ford Tractor, Inc. v. Great Am. Ins. Co.**, 194 S.W.3d 415, 424 (Tenn. Ct. App. 2005). We have carefully reviewed this entire record. Based upon our conclusion that BGC must pay the 2% gross receipts to Whiteville and Middleton as franchise fees, and that this contractual obligation was not otherwise negated by provisions of the MGSTEL and the RBL, we conclude that, although the trial court's order was procedurally defective, it nonetheless reflects payments due to Whiteville and Middleton. The fact that Bolivar unilaterally stopped paying these fees should not result in it receiving the benefit of that improper action. Considering the equities between the parties, and in light of our holdings herein, we conclude that the award of *pendente lite* payments did not harm Bolivar to such a degree as to require reversal.

For the foregoing reasons, we reverse the trial court's order to the extent that it finds that Bolivar and BGC were not liable for both PILOT and the 2% gross receipt franchise fees. We hold that Bolivar is liable for both payments under the statutory schemes and pursuant to its recently passed ordinances resolving to make PILOT. To the extent that the rate setting provisions of the Whiteville Ordinance conflict with BGC's statutory right to charge its consumers actual costs incurred in providing gas service, they are void. The trial court's order is affirmed in all other respects. The case is remanded for such further proceedings as may be necessary, and consistent with this Opinion. Costs of this appeal are assessed one-half to the Appellants, City of Bolivar, Bolivar Gas Company, and its surety, and one-half to the Appellees, the Town of Middleton, Tennessee, and the Town of Whiteville, Tennessee, for all of which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE